CARDIAC THORACIC AND VASCULAR SURGERY,
P.A. PROFIT SHARING TRUST and Donald L.
PATRICK *v.* Earl BOND and Filmtrust of Arkansas, Inc.

National Banking Corporation a/k/a National Bank of
Arkansas *v.* Worthen Bank and Trust Company, N.A.

Herb Sudbury, Intervenor

91-296 840 S.W.2d 188

Supreme Court of Arkansas
Opinion delivered November 2, 1992
[Rehearing denied December 14, 1992.]

*Warner & Smith*, by: *G. Alan Wooten* and *J. Randall McGinnis*, for appellants/cross-appellees Cardiac Thoracic and Vascular Surgery, P.A., Profit Sharing Trust and Donald L. Patrick.

*Hilburn, Calhoon, Harper, Pruniski & Calhoon, Ltd.*, by: *John E. Pruniski III*, for appellees Earl Bond and Filmtrust of Arkansas, Inc.

*Hankins, Hicks & Madden*, by: *Stuart W. Hankins* and *Sherry S. Means*, for appellees/cross-appellants National Banking Corporation and National Bank of Arkansas.

*Wright, Lindsey & Jennings*, for appellee Worthen National

Bank, N.A.

DARRELL D. DOVER, Special Chief Justice. In August 1988, Earl Bond, apparently a dabbler in land development as well as moving producing, contacted Dr. Donald L. Patrick, a Ft. Smith physician who had invested in some of Bond's movie ventures, relative to a plan Bond had conceived for the development of a 11.62 acre parcel of land in North Little Rock.

Earlier, in May 1988, Bond had entered into a purchase contract with National Bank of Arkansas (NBA), the owner of the land, providing for the purchase of the land at a price of $945,000 to be paid $445,000 in cash with a promissory note secured by a mortgage back to NBA representing the difference of $500,000. Dr. Patrick invested $400,000 cash in furtherance of Bond's plan and his $400,000 investment went toward payment of the cash portion of the purchase price.[1]

Key to Bond's plan for development of the 11.62 acre parcel was the construction of a building on a small portion of the parcel (apparently only two acres or so) and the leasing of space in the building. According to the testimony and a "Fact Sheet" intended for Bond's investors which was introduced in evidence, this would serve two purposes: (1) completing the construction of improvements in the form of the building would satisfy some legal restrictions with possible reverter implications imposed by the City of North Little Rock as part of its urban renewal program and (2) the income stream from leases would enable Bond to obtain financing for the initial construction of the building and for future development.

Accordingly, the Bond-NBA contract provided that NBA would lease at least 3,000 square feet of space in the building to be built and NBA further agreed that it would either arrange for other tenants to lease an additional 3,500 square feet or that NBA would lease the additional 3,500 square feet itself.

---

[1] Bond was the principal of and sometimes dealt in the name of, a corporation called Filmtrust of Arkansas, Inc. NBA and its parent, National Banking Corporation (NBC) are both parties to the lawsuit. Dr. Patrick's investment actually was made by his qualified profit sharing trust. In our view, these dual identities are not material to the litigation and we will therefore refer to Filmtrust/Bond as "Bond", to NBA/NBC as "NBA" and to Profit Sharing Trust/Dr. Patrick as "Dr. Patrick".

The sale-purchase transaction closed on August 16, 1988. Title to the land was deeded by NBA to Bond. The cash portion of the purchase price was paid and the promissory note and the mortgage securing same were delivered by Bond to NBA. Thereafter, the leases alluded to above did not materialize and, as time passed, all parties became disenchanted with the transaction.

Dr. Patrick filed suit against Bond and NBA alleging various misrepresentations on the part of Bond which (he alleged) entitled him to rescind their transaction and to have a return of his $400,000. It was further alleged that NBA was aware of the misrepresentations and was therefore sufficiently tainted so as to justify relief against it in the form of a subordination or forfeiture of its debt/mortgage interest.

NBA filed a cross-complaint against Bond for foreclosure of its $500,000 mortgage and a third party complaint against Worthen Bank & Trust Company, N.A. to foreclose the lien of a mortgage which Bond had granted to Worthen. Worthen cross-complained against Bond for foreclosure of its mortgage and collection of the related debt.

Bond counter-cross-complained against NBA alleging that NBA had breached various material provisions of its agreement with Bond and that Bond was therefore entitled to rescission of the purchase contract and cancellation of the $500,000 purchase money note and the mortgage securing the note.

This proceeding was in the lower court for nearly two years during which a record of over 2,100 pages was created. On May 10, 1990, after the initial round of pleadings, motions and hearings, the Chancellor issued a Letter Opinion in which she found that there was insufficient evidence to justify a rescission of the contract between Dr. Patrick and Earl Bond; that there was insufficient evidence to establish any relationship between Dr. Patrick and NBA and certainly no contract between those parties; but that there was sufficient evidence to establish that the contract of sale of the land in question between NBA and Bond should be rescinded on grounds of constructive fraud and that a resulting trust should be declared in favor of Dr. Patrick in at least part of the cash purchase price which she ordered refunded

to Bond.[2]

The Chancellor further found that rescission attempts to place the parties in the position they were in prior to the contract and she therefore ordered that NBA's obligation to return the cash down payment of $445,000.00 should be reduced by an amount equal to reasonable rental value of the land plus rents actually paid.

Following additional hearings having to do with the rental value of the property and the amount of the constructive trust in favor of Dr. Patrick, the Court entered a Decree on April 26, 1991, which dismissed Dr. Patrick's complaint against Bond for failure of proof; rescinded the contract of sale between Bond and NBA and cancelled the deed from NBA to Bond; awarded Bond judgment against NBA in the amount of the cash portion of the down payment, plus interest less rents actually paid and less the reasonable rental value of the property which the trial court found to be $194,374.87 and less real estate taxes for 1988, 1989 and 1990 (and pro rata 1991) which had become due subsequent to the conveyance by NBA to Bond but prior to the Decree, the amount of such taxes being $24,023.81. The NBA Purchase Money Note and Purchase Money Mortgage were found to be void. Worthen's Mortgage was also found to be void but, based on a stipulation of all parties except NBA, Worthen was awarded first claim against the judgment in favor of Bond and, after deduction of the amount of $18,000.00 to satisfy an attorney's lien, Patrick and Sudbury were to receive, by way of constructive or resulting trust, the balance of the judgment in favor of Bond against NBA.

The Chancellor's Decree appears to have pleased no one and virtually all of the parties have appealed and/or cross-appealed from her decision.

Despite the voluminous record in this case and the many arguments advanced by the parties below and here, the central

---

[2] The evidence disclosed that one Herb Sudbury had invested $100,000.00 in Mr. Bond's North Little Rock project. Even though not a party at the time of the Letter Opinion, Sudbury later intervened. His rights parallel those of Dr. Patrick in every way, he raised no independent issues and, except where specific differentiation is made, we intend to include him when we refer to Dr. Patrick.

issues which are largely dispositive of this matter number only two and they are:

(1) Is rescission of the NBA-Bond contract an appropriate remedy?

(2) If the Chancellor properly ordered rescission, was it proper to credit the fair rental value of the property against the amount to be returned to the Purchaser (Bond)?

We will discuss those issues in order.

## RESCISSION

NBA argues rather strenuously that this is simply not a case in which the doctrine of rescission can be applied. We believe, however, that NBA was misled — or chose to be misled — by references in the Chancellor's letter opinion of May 10, 1990, to "fraud". The Chancellor clearly differentiated between *constructive* fraud and what might be characterized as "actual" or "true" fraud, and specifically stated that " . . . .although there was insufficient evidence to find actual fraud, there was constructive fraud and, therefore, the contract of sale should be rescinded." *Letter Opinion, May 10, 1990.* Nevertheless, NBA seems to us to take the position that the Chancellor could not properly rescind the NBA-Bond contract without first finding that NBA was guilty of outright, intentional fraud.

That proposition is not well taken. To the contrary, as we said in *Davis v. Davis*, 291 Ark. 473, 725 S.W.2d 845 at 847 (1987):

"We have many times held that there may be a constructive fraud even in the complete absence of any moral wrong or evil intention."

Immediately preceding the quoted language, the *Davis* Court cited *Lane v. Rachel*, 239 Ark. 400, 389 S.W.2d 621 (1965) and the reasoning and holding of the *Lane* case is relevant here. The *Lane* case also involved an action to rescind a sales contract, cancel a deed, a note and a mortgage and for the recovery from the seller of the amount paid by the purchaser on the purchase of property. It appeared that the seller, or the seller's representatives, had represented to the buyer that the house in question had an adequate foundation to support its weight. That

later proved to be untrue, the house settled and substantial damage resulted, followed by the action to rescind. The seller's defense was that he was unaware of the subsoil conditions which apparently caused the settling and that the assurances given to the prospective purchaser were therefore not fraudulently made. In reversing the trial court in that case and in holding for the purchaser, this Court said:

> "To rescind a contract based upon fraud, it is not necessary that actual fraud exist. It is well settled that representations are construed to be fraudulent when made by one who either knows the assurances to be false or else not knowing the verity asserts them to be true. (Citing cases). In 37 C.J.S. Frauds, ¶2, Pg. 211, constructive fraud is succinctly defined as 'a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others *** *Neither actual dishonesty of purpose nor intent to deceive* is an essential element of constructive fraud'. [Emphasis in original]

> In the case at bar it is undisputed that the [purchasers] relied, to their detriment, upon the statements and assurances made to them by the [sellers] and these statements proved to be untrue. [Sellers] lack of knowledge of these material representations asserted by them to be true is no defense nor can liability be escaped by their good faith in making the representations." [239 Ark. 400 at 404].

Interestingly, as an additional or alternative basis for its decision, the *Lane* Court also invoked the maxim that if two innocent parties must suffer, the burden must be borne by the one who induced the loss and found that the seller's conduct and assurances induced the loss suffered by the purchasers in that case. That reasoning and that holding might also be apropos to this case.

Here, it is undisputed that NBA committed to Bond that it would lease 3,000 feet in the building and that it would guarantee the leasing of an additional 3,500 feet. Mr. Tullos, the then President of NBA who made that commitment in behalf of NBA, testified that he had every intention of honoring his promise and we will take that at face value. However, the record

also shows that there was a major reorganization of NBA in which Mr. Tullos and the board under which he served were replaced with a new president and a new board. Excerpts from the minutes of NBA's board meetings show clearly that the new regime at NBA had no interest in leasing anywhere near the square footage to which Mr. Tullos had committed NBA and that the board and the new president, Mr. Al Harkins, mistakenly felt no obligation to honor NBA's commitment made through the prior administration. Accordingly, even though NBA understandably views the evidence in a different light, it is clear to us, as it was to the Chancellor, that NBA breached its contractual duty to lease the space it had committed to lease.

█ The Chancellor applied the four part test set forth in *Ballard* v. *Carroll*, 2 Ark. App. 283, 621 S.W.2d 484 (1981) to this factual situation and we agree that that test is appropriate. As set forth in the *Ballard* case, the four part test is:

> (a) Was the fraud material to the contract; did it relate to some matter of inducement to the making of the contract?
>
> (b) Did it work an injury?
>
> (c) Was the relative position of the parties such, and their means of information such, that the one must necessarily be presumed to contract upon the faith reposed in the statements of the other?
>
> (d) Did the injured party rely upon the fraudulent statements of the other, and did he have a right to rely upon them?

*Ballard* v. *Carroll*, 2 Ark. App. 283, 621 S.W.2d 484 at 486.

█ It is clear to us that all four parts of this test were satisfied inasmuch as the lease commitments made by NBA were of the very essence of the contract insofar as the purchaser (Bond) was concerned and Bond obviously relied on these commitments in entering into the contract, in hiring a contractor and in taking other steps in furtherance of developing the property. With respect to the relative position of the parties test, that test answers itself in this case since only the party making the contractual commitments (NBA) was in a position to know whether or not its commitments would be honored. Finally, (and consistent with the

finding of materiality) there obviously was an injury in that the property could not be developed as planned without the commitments of NBA being honored.

We hold that the Chancellor correctly rescinded the contract between NBA and Bond.

## THE FAIR RENTAL VALUE CREDIT

 It is generally recognized that in an action for rescission of a contract in a court of equity, the court applies equitable principles in an attempt to restore the status quo or place the parties in their respective positions at the time of the sale. *Bates* v. *Simmons*, 259 Ark. 657, 536 S.W.2d 292 (1976). The equitable objective of a return to the status quo as the result of a rescission is consistent with the equitable maxim "he who seeks equity must do equity." The practical meaning of this maxim is that whatever the nature of the remedy sought, the court will not give equitable relief to one seeking it unless he will admit and provide for all of the equitable rights, claims and demands of his adversary growing out of, or necessarily involved in, the subject matter of the controversy. *Sample* v. *Sample*, 250 Ark. 731, 466 S.W.2d 935 (1971).

Having determined that rescission is the proper remedy in this case, it is incumbent upon this Court to assess the propriety of the lower Court's approach to restoring the status quo.

 Without question, our previous holdings make plain that a purchaser entitled to rescission has some obligation to the vendor for the purchaser's possession and/or use of the property in question. In *Bates* v. *Simmons*, cited *supra*, we endorsed the proposition that, in a rescission action, the requirement that the "purchasers" pay rent to the "seller" for the time the property is occupied is equitable. In *Dunham* v. *Phillips*, 154 Ark. 87, 241 S.W. 361 (1922), we held that where a buyer of a fruit orchard was entitled to rescind the purchase and recover the purchase money, he had a duty to restore the land *and* account for the rents and profits. In *Dunham*, the rescinding purchaser was ordered to pay the vendor the value of the crop raised and sold on the property while the land was in the purchaser's possession.

 The problem we face in this case is how to quantify what a rescinding purchaser owes to the vendor in attempting to

restore the status quo. In contrast to the facts in both *Dunham* and *Bates*, the property here was only partially occupied during the purchaser's possession. The income generated from that partial possession is readily known and without question must be returned to the vendor (NBA) to restore the status quo. The lower Court properly so ordered. However, the lower Court's additional award of $194,374.87 to the vendor NBA as reasonable rental value of the unoccupied portion of the property during Bond's time of possession, even though the evidence showed that at all times this portion of the property was unimproved, unoccupied and had never generated any rentals, is troublesome.

A review of the Arkansas land sale rescission cases reveals no instances where the restoration of the status quo resulted in the award to the vendor of "reasonable rentals" where the property in question was, as here, unoccupied and unimproved before, during and after the sale. Further, exhaustive research in other jurisdictions has failed to turn up any similar holding.

However, guidance on this issue can be found in the *Restatement of Restitution*. Section 157 of the *Restatement of Restitution* states:

(1) A person under a duty to another to make restitution of property received by him or of its value is under a duty:

(a) to account for the direct product of the subject matter received while in his possession, and

(b) to pay such additional amount as compensation for the use of the subject matter as will be just to both parties in view of the fault, if any, of either or both of them.

According to comment b of Section 157, "direct product" means that which is derived from the ownership or possession of the property. Thus, a person who has a duty to make restitution of the title to land is under a duty to restore amounts received by him as rent upon a lease existing before he acquired title. This is true regardless of the relative fault as between the parties. In land transactions, where the recipient of the land is not more at fault than the vendor, the recipient *is under no duty to pay for the value of the use of the land unless it was actually used.* If actually used, he is required to pay the reasonable value of the use *or what he received therefrom, at his election* (see comment d, Section

157).

This approach does find support in cases from other jurisdictions, although these cases do not exactly mirror the fact pattern of the present case. For example, in a rescission case involving misrepresentation, the Oregon Court in *LeTrace* v. *Elms*, 595 P.2d 1281 (Oregon 1979) stated that "buyers were only chargeable to the extent of the benefit actually derived from the use of the land during their occupation."

It should also be noted that in a myriad of rescission cases involving actual fraud, Courts of other jurisdictions have held that a rescinding purchaser, in addition to restoring the vendor to the property which was the subject of the sale, had a duty to reimburse the vendor *only* to the extent that the purchaser has profited by his possession of the property. *See* e.g., *Zimmerman* v. *Kent*, 575 N.E.2d 70 (Mass. App. Ct. 1991); *West* v. *McCoy*, 70 Cal. App. 3d 295, 138 Cal. Rptr. 660 (1977).

We believe the rule to be that in a case requiring restoration or return to the status quo, we must apply equitable principles in each case so as to best accomplish the undoing of wrong (*See Bates* v. *Simmons*, cited *supra*). We think that the parameters of this duty to balance as set forth in the *Restatement of Restitution*, and recounted above, best prescribe the equitable resolution of the present case. Accordingly, we reverse that portion of the Chancellor's Decree below which granted NBA credit for the reasonable rental value of the property beyond the actual rents received, which the Court found to be $194,374.87. In our view, the equities of this case do not support the award to NBA of the reasonable rental value of the property. The evidence showed that the unimproved portion of the property had never generated income and to award NBA credit for theoretical rentals unjustly rewards NBA and places it in a better position than it had been in at the time of the sale. Similarly, we note that had NBA remained the owner of the land (and that is the theoretical effect of rescission), the taxes for 1988-90 (and pro rata 1991) would have been its obligation and it should not benefit by being relieved of that burden.

As we view it, there is no evidence to indicate that NBA would have received $194,000 (or anything near) had it remained the owner and possessor of the property throughout and it *would*

have had to pay the taxes. The theory of rescission is to accomplish that result as nearly as possible and we think our holding does that.

## OTHER MATTERS

▇ NBA complained below, and continues its argument here, that rescission cannot possibly be proper because, according to NBA, the property is encumbered by the Worthen Mortgage, by the lien of the judgment against Bond, by a tax lien in favor of the Pulaski County Tax Collector and by certain reverter provisions in a resolution of the North Little Rock City Council. Worthen will be paid if NBA pays. The Chancellor so ordered and we are affirming except as specifically indicated above. Worthen's lien thus disappears as will the tax lien when NBA pays the taxes which we have held to be its obligation. The judgment lien in question arose *after* the filing of a *lis pendens* in this case and is therefore subject to the holding, which we affirm, that Bond never had a title to which that lien could attach.

## SUMMARY

We reverse as to the credits in favor of NBA for fair rent and value and for the 1988-90 and partial 1991 taxes. In all other respects, the Decree below is affirmed.

Special Justice ROSALIND MOUSER joins in this opinion.

HOLT, C.J., HAYS and CORBIN, JJ., not participating.