# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4249

_____

| | | |
|---|---|---|
| Donald D. Kessler, et al., on their own behalf and on behalf of all others similarly situated, | * * * * | |
| Plaintiffs - Appellants, | * * | Appeal from the United States District Court for the |
| v. | * * | Western District of Arkansas |
| National Enterprises, Inc.; Arkansas No. 1 LCC, | * * * * | |
| Defendants - Appellees. | * | |

_____

Submitted: May 8, 2000

Filed: January 30, 2001

_____

Before LOKEN, HEANEY, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

In the mid-1980s, plaintiffs purchased time-share interests in the Lakeshore Resort & Yacht Club (Lakeshore) in Hot Springs, Arkansas. Lakeshore is surrounded by the Lake Hamilton Resort Hotel (the Hotel). In December 1993, the Hotel revoked a license agreement that allowed time-share owners access to the Hotel's parking and recreational facilities, and also terminated Lakeshore's utilities.

As successor to Lakeshore's developer, defendant National Enterprises, Inc. (NEI) unsuccessfully sued the Hotel in the Arkansas courts to enforce the license agreement. Plaintiffs then filed the instant class action, claiming that Lakeshore's developer was obligated to provide utilities and continued access to the Hotel's parking and recreational facilities, and seeking to hold NEI liable for the initial developer's obligations. After remands following two threshold appeals, see 165 F.3d 596 (8th Cir. 1996), 203 F.3d 1058 (8th Cir. 2000), the district court entered judgment in favor of NEI. We now reverse and remand for calculation of damages.

## BACKGROUND[1]

In 1983, Painter's Point Development Company Limited Partnership (Painter's Point) began construction of a hotel and twenty-unit condominium resort on a tract of land located on the shores of Lake Hamilton in Hot Springs, Arkansas. Painter's Point commonly owned the hotel property and resort property until mid-1985, when it conveyed the resort property to the Lakeshore Resort & Yacht Club Limited Partnership (Lakeshore LP). Painter's Point continued to construct a hotel on the tract of land surrounding the resort property.

In June 1985, Lakeshore LP started Lakeshore, a time-share project organized pursuant to the provisions of the Arkansas Time-Share Act, Ark. Code Ann. §§ 18-14-101 to 18-14-602 (the Time-Share Act). Contemporaneous with its organization of the time-share project, Lakeshore LP reached a license agreement with Painter's Point that allowed individual purchasers of Lakeshore's time-share units to use hotel parking, as well as the recreational amenities contemplated in the operation of the hotel.

The Lakeshore time-share project had to be registered with, and accepted by, the Arkansas Real Estate Commission (the Commission) before time-share interests could

---

[1]The parties stipulated to all material facts in the district court.

be sold to prospective buyers. See Ark. Code Ann. §§ 18-14-202(a)(1), 18-14-204, 18-14-206(b), 18-14-207. Lakeshore LP filed an application for registration containing the public offering statement required by the Time-Share Act, see id. at § 18-14-204(a), and a document entitled "Horizontal Property Regime, Master Deed and Bylaws for Lakeshore Resort and Yacht Club."

The Master Deed referred to the time-share purchasers' rights to use hotel amenities by stating that

> [t]he Developer is presently contemplating construction of certain recreational facilities on property owned by the Developer adjacent to the property described in Exhibit "A". The Co-Owners of this Regime *shall have the right to use said recreational facilities* jointly with other property regimes established or to be established by the Developer or such other persons who are licenses or guests of the Developer. (Emphasis added).

The public offering statement referred to the Hotel license agreement,[2] but the agreement itself was not included with Lakeshore LP's application to the Commission. By letter dated July 3, 1985, the Commission accepted the Lakeshore application

---

[2]The public offering statement indicated that

> [a] license agreement by and between [Lakeshore] and [the Hotel] allows purchasers of time-share intervals to utilize at hotel guest rates all indoor and outdoor hotel amenities which include:

| | |
|---|---|
| Tennis Courts | Boat Docks |
| Indoor Pool | Outdoor Pool |
| Exercise Room | Game Rooms |
| Cocktail Lounge | Restaurants |

> Additional amenities which may be added in the future.
> At present time there are no use fees.

-3-

conditioned upon the submission of "the Licensing Agreement referred to in the Public Offering Statement that is intended to insure use of hotel amenities by the Time-Share Purchaser."

Lakeshore LP submitted the license agreement to the Commission, but it was not accepted. In a letter dated August 11, 1985, the Commission stated

> the Licensing Agreement was not accepted as written. . . . [T]he Licensing Agreement must be drafted so that the Agreement cannot be voided or cancelled by either the [Lakeshore] developer or the [Hotel owner]. The Agreement should be drafted so that it will be in existence as long as the Time-Share program exists, to insure the promised use of the amenities by Time-Share Interval purchasers.

The Commission accepted the application only after a revised "irrevocable" license agreement[3] was submitted.

_____

[3]The amended license agreement provided, in pertinent part, that

1.     Lakeshore has purchased real property from Painter's Point with the understanding and agreement that the use of all recreational amenities and parking facilities owned by Painter's Point and employed by it in the operation of the [Hotel] shall extend to and be available under this License to each time-share condominium purchaser purchasing units of interval ownership (i.e., time-share condominiums) from Lakeshore.

2.     Use, enjoyment, and benefit of all recreational amenities and twenty (20) unidentified parking spaces is hereby granted, transferred, and conveyed to Lakeshore.

. . .

Following registration, Lakeshore LP began marketing time-share interests to the named plaintiffs and other members of the class. Each purchase was memorialized by a Warranty Deed that incorporated by reference the Lakeshore Resort Master Deed and By Laws, and gave the purchasers a time-share interest in the resort until noon on the first Friday of the year 2020.

A sales brochure given to the plaintiffs represented that "[a]s a Lakeshore owner all of the facilities at the [Hotel] are yours to use and enjoy." In addition, during the application process with the Commission, Lakeshore LP represented that the license agreement with the Hotel "provid[es] for the continued use of all amenities and parking facilities of the resort by the timeshare owners of Lakeshore Resort and Yacht Club." NEI stipulated that representations made during the application process were corroborated by oral representations made by sales agents to individual purchasers.

NEI also stipulated that representations were made that time-share purchasers would receive standard utilities in exchange for paying annual maintenance fees. Finally, NEI stipulated that the plaintiffs' decisions to purchase time-share interests were based upon the express representations regarding the continued use of the Hotel amenities, and that plaintiffs would not have purchased their time-share interests absent the continued use of the Hotel amenities.

The Hotel honored the terms of the license agreement for the first seven or eight years of each plaintiff's contemplated thirty-five year interest in the time-share project. Lakeshore also provided utilities, such as sewer and water, via the Hotel property in

---

5.  This License Agreement is irrevocable.

6.  This License Agreement is expressly understood to be a nonexclusive grant of the license hereby irrevocably conveyed.

-5-

exchange for annual maintenance fees. Problems arose, however, after a series of changes in the financing and ownership of both the Lakeshore and Hotel properties.

Lakeshore LP transferred its interests in the Lakeshore property to Hansen, Hooper & Hayes, Inc. (HHH) in August 1986. HHH then executed a note and mortgage in favor of Independence Federal Savings & Loan (Independence) with the Lakeshore property pledged as collateral. In 1991, Independence went into receivership, and the Resolution Trust Corporation (RTC) was appointed as receiver. HHH subsequently defaulted on the note and the RTC started foreclosure proceedings against the Lakeshore property. In October 1993, NEI purchased the note and mortgage from the RTC, and then purchased the Lakeshore property itself following a foreclosure sale in May 1994. For present purposes, then, NEI stood in the shoes of Lakeshore LP as owner of the Lakeshore property.[4]

The Hotel property also experienced a series of changes. The original developer (Painter's Point) defaulted on its financing. The lender, Union Planter's, initiated foreclosure proceedings against the Hotel in November 1988. Union Planter's purchased the Hotel following a foreclosure sale in September 1990. In December 1990, Union Planter's sold the Hotel property to Robert and Shannon Fewell. In April 1991, the Fewells conveyed the Hotel to their own corporation, Lake Hamilton Resort, Inc. For present purposes, then, we have referred to Lake Hamilton Resort, Inc., as the Hotel.

Before NEI purchased Lakeshore's note and mortgage, the Hotel managed the time-share interests in the Lakeshore property pursuant to an agreement with the RTC. The Hotel collected revenues, paid expenses, then split the profits with the RTC, all the

---

[4]Subsequently (on September 18, 1995), NEI transferred its interest in Lakeshore to defendant Arkansas No. 1 LLC. For convenience, we refer to NEI and Arkansas No. 1 LLC collectively as NEI.

-6-

time honoring the license agreement that provided time-share owners with access to Hotel amenities and parking.

After NEI became involved, the Hotel began negotiating with NEI to buy Lakeshore's note and mortgage.  The Hotel offered $275,000, based in part upon its belief that it was not legally required to honor the license agreement.  The Hotel stated that

> [Lakeshore] is a very unusual piece of property and is of little value to anyone other than the owner of the hotel.  As you know, the condos have many problems that affect their market value.  The condos have no parking nor any property for parking to be added.  The utilities are furnished by the hotel and could be disconnected.  There is no legal requirement for the hotel to provide either parking or utility services.  Also, without access to the hotel's recreation amenities (i.e. swimming pools, marina, etc.) there would be little reason to stay in the condos.

NEI responded by demanding $1,000,000 for the sale of Lakeshore's note and mortgage, based in part upon NEI's belief that the Hotel was legally obligated to honor the license agreement.  NEI stated that

> [w]hile we recognize that there may be some perceived concerns surrounding parking and utility access, and recreational amenities, we believe your best interests would not be served by disconnecting, or refusing access to these services for the time being.  At minimum, such action could be construed as a violation of the timeshare holders' entitlements, as set forth in a Memorandum of Agreement which was recorded along with the original sale and follows along the chain of title for this property.

On November 2, 1993, the Hotel rejected the $1,000,000 counter-proposal, calling it "totally off-base."  The Hotel considered itself  "under no legal obligation to

provide any services, parking or Hotel facilities to any resident or timeshare holder." On December 3, 1993, the Hotel advised the individual time-share owners that all utilities provided to Lakeshore via the Hotel property would be disconnected, and that time-share owners would no longer have access to Hotel amenities and parking. The Lakeshore time-share units have been unusable ever since.

NEI purchased the Lakeshore note and mortgage itself in May 1994, then promptly filed suit against the Hotel in Garland County Chancery Court to enforce the "irrevocable" license agreement. In August 1994, following trial, the state court directed entry of judgment for the Hotel. The court concluded that the license agreement was a mere license and created no other interest in the Hotel property; that the license agreement's purported "irrevocable" nature did not survive the Hotel's foreclosure; and that Lakeshore time-share owners had only an easement of necessity for ingress and egress over the Hotel property.

## PROCEDURAL HISTORY

In November 1996, after NEI's unsuccessful attempt to enforce the license agreement against the Hotel, the plaintiffs initiated the instant class against NEI in state court. Count I of the complaint alleged that the denial of access to Hotel amenities and parking constituted a breach of their contracts with the initial developer, and that NEI assumed the obligations of the initial developer pursuant to § 18-14-601 of the Time-Share Act.[5] Count II alleged that the initial developer misrepresented that the time-

_____

[5] Section 18-14-601 is entitled "Financing of time-share programs" and provides as follows:

In the financing of a time-share program, the developer shall retain financial records of the schedule of payments required to be made and the payments made to any person or entity which is the lienholder of any underlying blanket mortgage, deed of trust, contract of sale, or other lien or encumbrance. *Any transfer of the developer's interest in the time-*

share estates would include access to Hotel amenities and parking, and again alleged that NEI was responsible for the initial developer's obligations pursuant to the Time-Share Act. As to both counts, the plaintiffs' alleged that they had no adequate remedy at law, and in the alternative asked for equitable rescission of the remaining portion of their time-share estates, and a corresponding partial refund of their respective purchase prices.

NEI removed the action to federal court, and then filed a third-party complaint against the Hotel regarding the license agreement. NEI also moved for summary judgment claiming that the plaintiffs' claims were barred by the doctrine expressed in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942), and its statutory counterpart, 12 U.S.C. § 1823(e), due to NEI's status as the foreclosure sale purchaser of an asset acquired by the RTC. The district court dismissed NEI's third-party complaint against the Hotel, but granted NEI's summary judgment motion. We reversed and remanded after concluding that the claims were not barred by the D'Oench doctrine. See Kessler v. Nat'l Enters., Inc., 165 F.3d 596 (8th Cir. 1999).

On remand, the parties submitted the case to the district court on stipulated facts and an agreed documentary record. The court entered judgment in favor of NEI, concluding that NEI was not liable as a successor and that, in any event, the initial developer was not liable for breach of contract or misrepresentation (constructive fraud). Plaintiffs appeal; NEI cross-appealed challenging the prior dismissal of NEI's third-party complaint against the Hotel. We dismissed NEI's cross-appeal because it should have been pursued when plaintiffs brought their first appeal. See Kessler v.

---

*share program to any third person shall be subject to the obligations of the developer.*

Ark. Code Ann. § 18-14-601 (emphasis added).

Nat'l Enters., Inc., 203 F.3d 1058 (8th Cir. 2000). We now address the remaining issues raised by the plaintiffs.

## DISCUSSION

### I.      Standard of Review

The district court granted summary judgment after the case was submitted to it on a stipulated record without trial. Therefore, de novo is the proper standard of review. See Am. Civil Liberties Union v. City of Florissant, 186 F.3d 1095, 1097 (8th Cir. 1999) (discussing standard of review for a case submitted on a stipulated record); Turner v. Iowa Fire Equipment Co., 229 F.3d 1202, 1209 (8th Cir. 2000) (discussing standard of review for a district court's grant of summary judgment).

### II.      NEI's Liability for the Developer's Obligations

Because the plaintiffs seek a partial equitable rescission of their original purchase contracts, a critical threshold question is whether NEI can be held liable for the initial developer's alleged breaches of contract and/or misrepresentations. The plaintiffs assert that § 18-14-601 of the Time-Share Act provides that NEI is liable for all obligations of the initial developer. Alternatively, the plaintiffs contend that NEI either expressly or impliedly assumed the developer's obligations under common law principles of corporate successor liability.

The district court determined that NEI succeeded only to the property interests conveyed in the May 1994 foreclosure sale, and that those property interests did not include the initial developer's obligations to provide utilities, and access to Hotel amenities and parking. The district court further determined that § 18-14-601 of the Time-Share Act refers only to the transfer of the developer's obligation to perform

-10-

certain record-keeping functions, not to a transfer of *all* obligations of the initial developer.

We disagree. We conclude that § 18-14-601 means what it says. "Any transfer of the developer's interest in the time-share program to any third person shall be subject to the obligations of the developer." The statute does not limit the obligations transferred to certain record-keeping functions. Instead, the statute refers to *all* of the developer's obligations *vis a vis* the individual time-share owners.

Our interpretation of § 18-14-601 is hardly novel. In a separate state court proceeding brought against NEI by Lakeshore time-share owners Charles and Mickie Rea (presided over by the same Garland County Chancery Court that decided the license agreement dispute), the court held that NEI was liable for the misrepresentations of the original developer pursuant to the provisions of the Time-Share Act. That decision was affirmed by the Arkansas Supreme Court on procedural grounds, without addressing the merits. See Nat'l Enters., Inc. v. Rea, 947 S.W.2d 378, 380 (Ark. 1997).

Though the Arkansas Supreme Court has not had occasion to address the meaning of § 18-14-601, that provision is derived from a model act adopted verbatim by several other states. See Iowa Code Ann. § 557A.18; Neb. Rev. Stat. § 76-1739; Tenn. Code Ann. § 66-32-127; see also Guam Code Ann. § 47501.

One state, Tennessee, has addressed precisely the question at stake here: Do the initial developer's obligations transfer to a third party (by operation of the Time-Share Act) as the result of a foreclosure sale. State v. Heath, 806 S.W.2d 535 (Tenn. Ct. App. 1990). In Heath, the Tennessee Attorney General sued to prevent the foreclosure of certain unsold units in a time-share program, unless at the time of the foreclosure

-11-

sale the rights of all non-defaulting time-share purchasers were specifically recognized and preserved. See Heath, 806 S.W.2d at 536-37. The court held that

> [t]hese provisions of the Act [referring to a transfer of the developer's interest] are to protect a consumer from what actually transpired in this case, i.e., foreclosure by lender that extinguishes the rights of the non-defaulting purchaser. While the statute does not forbid foreclosure, it requires any foreclosure to take into account the purchasers of the time-shares' interest.

Id. at 538.

The court noted that the legislature intended to give time-share purchasers a remedy against *both* the developer's lender and the third party to whom the developer's interest is sold, because a foreclosure-in-process is a good sign that any remedy against the developer itself would be meaningless:

> Section 127 states that any third party to whom the developer's interest is transferred shall be subject to the developer's obligation even if, arguendo, the bank was not required to comply with section 128[6] when the agreement was made, the bank as transferee would assume the obligations of compliance once the developer defaulted.

---

[6]Section 66-32-128 of the Tennessee Time-Share Act is identical to § 18-14-602 of the Arkansas Time-Share Act, which provides that

> [t]he developer whose project is subjected to an underlying blanket lien or encumbrance subsequent to the transfer of a time-share interval shall protect nondefaulting purchasers from foreclosure by the lienholder by obtaining from the lienholder a nondisturbance clause, subordination agreement, or partial release of the lien as to those time-share intervals sold or shall provide a surety bond or insurance against the lien from a company acceptable to the agency.

-12-

The overriding purpose of the Time-Share Act is to protect consumers. Regulatory, civil and criminal remedies are provided. To hold that a civil remedy against a lender [or other third-party transferee] is inapplicable would defeat the legislative intent. Ordinarily, a developer defaults on a note because it has no money to pay its obligation. To conclude that the legislature intended to limit the consumer's civil remedies to an action for damages against the developer under Section 128 would be a meaningless gesture.

Id.

The instant case is indistinguishable from Heath for all material purposes. In both cases, the original developer defaulted, the lender foreclosed, and a third party purchased (or intended to purchase) the developer's interest at the foreclosure sale. Under the reasoning in Heath, § 18-14-601 mandates that NEI "shall be subject to the obligations of the developer."[7]

Florida has also enacted a provision in its Time-Share Act that serves the same purpose as § 18-14-601 of the Arkansas Time-Share Act, though the statutory language is not identical. See Fla. Stat. Ann. § 721.17. In Bell v. RDI Resort Servs. Corp., 637 So. 2d 960 (Fla. Dist. Ct. App. 1994), the court held that the Florida legislature intended that subsequent third-party participants in the operation of a time-share project could be held liable for alleged misrepresentations made by the original developer. See Bell, 637 So. 2d at 962; see also Smith v. Dept. of Bus. Regs., 504 So.2d 1285 (Fla. Dist. Ct. App. 1987) (financier who accepted assignment of unsold time-share units as

---

[7]Our conclusion is not changed by the fact that the Master Deed contemplated that, no later than three years after the first sale of an individual time-share interest, the original developer's obligations would transfer to a "Council of Co-Owners" made up of individual time-share owners. It is undisputed that a Council of Co-Owners was never formed in this instance. Thus, the developer, and any party to whom the developer's interests were transferred, remained subject to the statutory requirements imposed by the Arkansas Time-Share Act.

collateral for balance of loan to time-share developer was subject to statute requiring developer to honor rights of purchasers).

Our interpretation of § 18-14-601 is thus consistent with the nature of time-share projects, and the unique obligations that arise from the development and creation of such projects. The developer sells not only an interest in real property, but an interest in time. The time-share regime is meaningless unless the time-share purchasers' continued interests in the project are protected. Thus, when a developer's interests in the project are transferred to a third party, the transferee must acquire not only the interest in the property, but also all the other obligations of the developer with respect to the time-share regime.[8]

## III. Statute of Limitations

The second question we must address is whether the plaintiffs' cause of action is time-barred. The district court addressed both the general five-year statute of limitations for breach of contract claims found at Ark. Code Ann. § 16-56-111(b), and the general three-year statute of limitations for constructive fraud claims found at Ark. Code Ann. § 16-56-105(3), and concluded that the plaintiffs' claims were not barred under either statute.

We agree with the district court's conclusion, but not with its reasoning. Having determined that NEI may be subject to liability for the original developer's obligations

---

[8]Having concluded that NEI may be liable for the original developer's obligation pursuant to § 18-14-601, we decline to address the plaintiff's alternative argument that NEI assumed the developer's obligations under common law principles of corporate successor liability. We express our doubts, however, that those common law principles would apply to this type of real estate transaction, or that NEI would be liable absent the requirements of the Time-Share Act.

pursuant to the Arkansas Time-Share Act, we conclude that Time-Share Act's statute of limitations governs this action. See Shelton v. Fiser, 8 S.W.3d 557, 560 (Ark. 2000) (holding that, under Arkansas law, a specific statute of limitations involving the particular subject matter governs over more general statutes).

The Time-Share Act actually contains two separate four-year statutes of limitations. The first applies to proceedings "where the accuracy of the public offering statement or validity of any contract or purchase is in issue *and* a rescission of the contract or damages is sought." Ark. Code Ann. § 18-14-403 (emphasis added). In such a situation, suit "must be commenced within four (4) years of the date of the contract of purchase." Id.

The second limitation period applies to proceedings "with respect to the enforcement of provisions in the contract of purchase which require the continued furnishing of services and the reciprocal payments to be made by the purchaser." Suit must be commenced within "four (4) years for each breach." Id. This second limitation period can be shortened to two years by agreement of the parties. See id.[9]

The plaintiffs' initiated this suit on November 27, 1996. The plaintiffs entered their contracts of purchase more than four years earlier, so this action is barred if the first limitation period applies. However, the first "breach" of contract requiring "the continued furnishing of services" did not occur until December 10, 1993, when the Hotel terminated Lakeshore's utilities and access to Hotel amenities and parking. The plaintiffs filed this action within four years of that date, so this action is timely if the second limitation period applies.

---

[9]There is no agreement in this case to shorten the statutory period to two years.

The plaintiffs do not challenge the accuracy of the public offering statement, or the validity of any contracts of purchase. Instead, their claims are based on "provisions in the contract which require the continued furnishing of services" — that is, access to the Hotel amenities and parking, as well as the continued furnishing of utilities. Due to NEI's unsuccessful attempt to enforce the license agreement, NEI is legally incapable of actually furnishing the described services. Thus, the plaintiffs have no adequate remedy at law and are entitled, in the alternative, to pursue a claim for equitable rescission. See Strout Realty, Inc. v. Burghoff, 718 S.W.2d 469, 474 (Ark. Ct. App. 1986). We do not believe that this equitable remedy, sought in lieu of actual contract enforcement, equates to the type of rescission claim contemplated by the first limitation period set forth in § 18-14-403. The plaintiffs' suit is more appropriately viewed as an attempt to enforce contract provisions that require the continued furnishing of services, services for which the plaintiffs made reciprocal payments (consideration for the original contract payments, or ongoing annual maintenance fees), with equitable relief sought in lieu of an adequate remedy at law. Thus, we hold that this action is governed by the second statute of limitation set forth in § 18-14-403, and is therefore timely.

## IV. Misrepresentation/Constructive Fraud

Having determined that NEI may be liable for the obligations of the initial developer, and that the statute of limitations is satisfied, we turn now to the merits of plaintiffs' claim. Plaintiffs contend that the initial developer made misrepresentations regarding the time-share owners' continued access to Hotel amenities and parking.

Under Arkansas law, a buyer of property may be entitled to rescind the purchase contract if the purchase was induced by constructive fraud. Constructive fraud may be found in the absence of actual fraud:

> To rescind a contract based upon fraud, it is not necessary that actual
> fraud exist. It is well settled that representations are construed to be

fraudulent when made by one who either knows the assurances to be false or else not knowing the verity asserts them to be true. . . . *Neither actual dishonesty of purpose nor intent to deceive* is an element of constructive fraud.

Lane v. Rachel, 389 S.W.2d 621, 624 (Ark. 1965) (emphasis in original); see also South County, Inc. v. First West.Loan Co., 871 S.W.2d 325, 327 (Ark. 1994) (describing constructive fraud as the "making of misrepresentations by one who, not knowing whether they are true or not, asserts them to be true without knowledge of their falsity and without moral guilt or evil intent"); Cardiac Thoracic & Vascular Surgery, P.A. Profit Sharing Trust v. Bond, 840 S.W.2d 188, 191 (Ark. 1992) (holding that a cause of action for constructive fraud will lie even when the misrepresentations were made innocently, and their false nature is not discovered until well after the representations are made). To establish constructive fraud under Arkansas law, the misrepresentation must be material. See Scollard v. Scollard, 947 S.W.2d 345, 348 (Ark. 1997).

In this case, the material nature of the misrepresentation is satisfied by NEI's stipulation that the plaintiffs would not have purchased their time-share interests without access to the Hotel amenities and parking. The question remains, however, whether the developer represented that the plaintiffs would enjoy *permanent* access to the Hotel's parking, utilities, and recreational amenities throughout the life of the time-share interests. We conclude that the developer made those representations.

We find persuasive the fact that the Arkansas Real Estate Commission reviewed the public offering statement and Master Deed, and concluded that those documents "promised" the "use of the amenities by Time-Share Interval purchasers." We find even more persuasive the fact that the Commission would not accept the Lakeshore time-share application until the license agreement referenced in the public offering statement was amended to purportedly provide time-share owners with *permanent* access to the

-17-

licensed amenities. The Commission demanded a license agreement that was "drafted so that it will be in *existence as long as the Time-Share program exists*, to insure the promised use of the amenities by Time-Share Interval purchasers." (Emphasis added). The developer responded with an amended license agreement representing that it "provid[es] for the continued use of all amenities and parking facilities of the resort by the timeshare owners of Lakeshore Resort and Yacht Club." NEI's subsequent stipulation, that this representation was later corroborated by oral representations made to individual purchasers by the developer's sales agents, is the linchpin in support of our conclusion that the developer represented to plaintiffs that they would have permanent access to the Hotel amenities and parking.[10]

## CONCLUSION

NEI assumed the obligations of the original developer pursuant to § 18-14-601 of the Arkansas Time-Share Act. This suit, brought pursuant to that Act, is timely. The original developer misrepresented the plaintiffs' right to continued access to Hotel amenities and parking. Therefore, the plaintiffs are entitled to equitable relief in the form of partial rescission. Accordingly, we reverse the judgment of the district court, and remand for calculation of damages.

LOKEN, Circuit Judge, dissenting.

My problem with the court's resolution of this difficult case stems from its sleight-of-hand treatment of the statute of limitations issues. The court concludes that the original developer was guilty of constructive fraud when its promise of permanent access to the Hotel's amenities induced plaintiffs to purchase their time-share units.

---

[10]Having concluded that the plaintiffs' have an actionable claim for constructive fraud, we find it unnecessary to address the breach of contract claim, since the plaintiffs seek identical damages under both claims.

That alleged fraud clearly occurred when plaintiffs made their time-share purchases in 1985 and 1986.  The court concludes these fraud claims are not time-barred under the second limitations period set forth in § 18-14-403 of the Time-Share Act:

> However, *with respect to the enforcement of provisions in the contract* of purchase which require the continued furnishing of services . . . the period of bringing a judicial proceeding will continue for a period of four (4) years *for each breach.*

(Emphasis added.)  On its face, this is a breach-of-contract statute of limitations. Plaintiffs' constructive fraud claims do not seek to enforce the purchase contracts; these claims seek rescission of those contracts on the ground they were fraudulently induced. The remedy for plaintiffs' fraud claims -- as opposed to the remedy for their breach of contract claims -- is not, to use the court's phrasing, an "equitable remedy, sought in lieu of actual contract enforcement."  Id. at p.16.

Therefore, these constructive fraud claims must be timely under the three-year statute of limitations for misrepresentation claims found in ARK. CODE ANN. § 16-56-105. See Wilson v. General Elec. Capital Auto Lease, Inc., 841 S.W.2d 619, 620 (Ark. 1992).  Absent concealment of the misrepresentation, that statute begins to run when the injury occurs, not when it is discovered.  See Chalmers v. Toyota Motor Sales, USA, Inc., 935 S.W.2d 258, 261 (Ark. 1996).  Here, the alleged misrepresentations occurred when plaintiffs purchased their time-share interests in 1985 and 1986. Plaintiffs were injured at that time, for the unknown flaw in the License Agreement existed, and plaintiffs could have sued the developer for rescission (in the event the License Agreement could not be reformed to provide permanent access, for example, by the Hotel granting an easement).

Under Arkansas law, fraudulent concealment tolls the statute of limitations until the constructive fraud is discovered.  But concealment is not presumed.  "There must

-19-

be some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed, or perpetrated in a way that it conceals itself." Wilson, 841 S.W.2d at 620 (quotation omitted). In this case, plaintiffs do not allege fraudulent concealment by the original developer, and there is no factual basis in the record for such an assertion. Therefore, because plaintiffs did not file this action until November 1996, their claims of constructive fraud are time-barred under the Arkansas statute of limitations governing actions for fraud.[11]

I also have substantial doubt whether, on this record, the Supreme Court of Arkansas would find a material misrepresentation of fact by the original developer that can support plaintiffs' claims of constructive fraud. To establish constructive fraud under Arkansas law, there must be a material misrepresentation of fact. See Scollard v. Scollard, 947 S.W.2d 345, 348 (Ark. 1997). All the express representations contained in the Master Deed and the developer's public offering statement were true when plaintiffs purchased their time share intervals in 1985 and 1986. The record does not reflect whether plaintiffs also reviewed the developer's License Agreement with the Hotel before purchasing their time-share intervals. If they did, they would have seen that the agreement purported to be "irrevocable." That was a true statement. Plaintiffs argue it was also an implicit misrepresentation they would enjoy permanent access to the Hotel's amenities. But Arkansas fraud law requires proof that the defendant had an insufficient basis upon which to make a representation that turns out to be false.

---

[11]Alternatively, these claims are governed by, and time-barred under, the first limitations period in § 18-14-403 of the Time-Sharing Act, which provides that actions seeking "rescission of the contract or damages" based upon "the accuracy of the public offering statement" must be commenced "within four (4) years after the date of the contract of purchase." This statute reflects the traditional principle that rescission is not appropriate when a contract has been performed to the point that the parties cannot be returned to the status quo. See Herrick v. Robinson, 595 S.W.2d 637, 644 (Ark. 1980). Here, for example, plaintiffs enjoyed use of their time-share units with full access to the Hotel's facilities for at least seven years.

Here, the developer renegotiated the License Agreement to be "irrevocable," and the Real Estate Commission accepted that change as satisfying its demand that time-share owners be provided permanent access to the licensed amenities. This sequence of events provided a strong basis in fact for the developer's alleged representation that time-share owners would have permanent access to the Hotel's parking, utilities, and recreational facilities. See Titan Oil & Gas, Inc. v. Shipley, 517 S.W.2d 210, 221 (Ark. 1974) (no constructive fraud if the defendant proves he "did not know, or in the exercise of reasonable care could not have known, of the untruth or omission").

Finally, I conclude the district court was correct in granting judgment in favor of NEI on plaintiffs' breach-of-contract claims. These claims are not time-barred, but plaintiffs cannot point to any contractual promise that was breached. Plaintiffs' contracts to purchase their time-share real property interests were initially reflected in Interval Ownership Purchase Agreements, which then merged at closing with the Warranty Deeds they received. See THOMPSON ON REAL PROPERTY § 99.06 (David A. Thomas ed. 1994). The Warranty Deeds conveyed title to the time-share unit weeks; they contained no promises regarding amenities, utilities, or parking. The Warranty Deeds incorporated by reference the Lakeshore Resort Master Deed and By-Laws, but those documents likewise contained no absolute promise of amenities, utilities, or parking. The Master Deed simply recited that the developer "is presently contemplating construction of certain recreation facilities on property" adjacent to the Lakeshore Resort, and it established that time-share owners would be liable for maintenance fees.[12] Thus, plaintiffs received, and continue to be able to receive, exactly what their purchase contracts promised -- ownership of their time-share intervals, and the right to use the common areas of the Lakeshore Resort during those

---

[12]The Master Deed also referred to a Management Agreement as "Exhibit C." There is no copy of this agreement in the record on appeal, and plaintiffs do not allege that the Developer breached any management contract.

-21-

intervals. There was no breach of contract by the original developer entitling plaintiffs to rescind.

For the foregoing reasons, I conclude that plaintiffs have no surviving breach of contract or constructive fraud claims against the original developer, NEI therefore has no successor liability, and the judgment of the district court must be affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.